John Van CUREN *v.* ARKANSAS PROFESSIONAL
BAIL BONDSMAN LICENSING BOARD

CA 01-1063 84 S.W.3d 47

Court of Appeals of Arkansas
Division I
Opinion delivered September 4, 2002

---

44

*The Rogers Law Firm*, by: *Edmundo G. Rogers*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Kim Evans*, Ass't Att'y Gen., for appellee.

S AM BIRD, Judge. John Van Curen has appealed from the Pulaski County Circuit Court's affirmance of a decision by the Arkansas Professional Bail Bond Licensing Board ("Board") revoking his license as a bail bondsman. On January 29, 1999, appellant accepted $3,500 from the family of Hector Aquirre ($3,000 by check from Hector's sister, Sandra Aquirre, and $500 in cash) to secure Hector's release from the Benton County jail on a $35,000 bond. The bond was secured by the titles to three vehicles owned by members of Hector's family. Through administrative error, the bond that was actually written was for $3,500; however, appellant accepted a premium for a $35,000 bond. Within a day, appellant learned that Hector was not bondable because the Immigration and Naturalization Service (INS) had placed a hold on him. Through Hector's attorney, David Bailey, Carlos Vasquez (Hector's sister's live-in boyfriend whom she called her "husband" and whose name and signature appeared on two of the car titles) tried unsuccessfully to get appellant to return the money and collateral.

In the criminal case against Hector, Mr. Bailey moved to cancel the bond and for a refund of the bond premium. A hearing on the motion was held on March 4, 1999. Appellant produced a copy of a receipt dated January 30, 1999, for $3,115 (the difference between premiums on a $35,000 bond and a $3,500 bond) purportedly signed by Mr. Vasquez, but Mr. Vasquez denied having signed it. When the judge realized that the hearing would require more time than the five minutes that had been allotted for it, the hearing was continued.

Another hearing was held on March 12, 1999. Appellant testified that, on Saturday, the day after he had accepted the bond money and collateral, he had returned $3,115 in cash to Mr. Vasquez at the jail and received a receipt from him. Mr. Vasquez, however, denied that appellant had returned any of the money to him and stated that he had not signed the receipt. He also testified that he was not at the jail on Saturday but, instead, was at home waiting for Hector to call. Sandra testified that she and Mr. Vasquez were at home all day on Saturday waiting for Hector to call and that Mr. Vasquez did not go to the jail that day. Sandra's

mother also testified that she was at home all day with Mr. Vasquez and Sandra and that Mr. Vasquez did not go to the jail.

The circuit judge compared Mr. Vasquez's signature on the titles used as collateral with his purported signature on the receipt and stated:

> I'm not a handwriting expert but the signature on this receipt certainly looks like the signature that's on this bill of sale and on these titles. It — doesn't just a little bit resemble it, it resembles it a whole lot . . . and based on that your motion as for a refund of the bond is denied.

An order denying the motion was entered on March 15, 1999. Holt Bonding Company, appellant's employer, eventually returned the collateral upon being released from the bond.

On March 1, 1999, Mr. Bailey filed a complaint against appellant with the Board, asserting that appellant had failed to refund the bond premium, even though Hector had not been permitted to leave the jail as a result of the INS hold. In his response to the Board, appellant asserted:

> Mr. Baily [sic] did a motion to return bond premium on Mr. Aquirre. I went to court in regards to this motion. I had a receipt showing where I had returned money in question to a family member so the motion was denied and judge found in our favor. I am sending with this letter a copy of the court document that shows this proceeding.

The Board held a hearing on December 10, 1999, at which appellant appeared without counsel. Holt Bonding Company was represented by counsel. Mr. Bailey testified that, when he learned on the Monday after the bond was written that Hector had not been released because of the INS hold, he determined that "there was no way that [Hector] was going to hit the street" and he called appellant to request a refund of most, if not all, of the bond premium. Mr. Bailey said that appellant told him that it was not his (appellant's) fault that Mr. Bailey's client was still in jail and referred him to Edmundo Rogers (appellant's attorney in this proceeding), whom, he said, could get Hector out of jail. Mr. Bailey stated that, after talking to Mr. Rogers, he was still convinced that

it would be an uphill battle to get Hector out of jail and again called appellant to request a return of the premium, less a small amount for his trouble. According to Mr. Bailey, he informed appellant that they might sue him for the refund and appellant replied, "Bring it on." Mr. Bailey also testified that, before March 4, 1999, appellant never told him that he had a receipt for the $3,115. Mr. Bailey stated that, although he had not had the receipt examined by a handwriting expert, he believed the signature on the receipt was a forgery.

Mr. Vasquez testified that he never received any refund from appellant or his employer and that he did not sign the receipt. He also said that he and his wife were not at the jail on the Saturday in question. Mr. Vasquez testified that he had been unsuccessful in his attempt to obtain a refund of the money within the criminal proceeding. Sandra also testified that appellant never returned the money.

Appellant testified that he met Mr. Vasquez at the jail on Saturday and gave him the cash refund. He said that he did not learn of the INS hold until Sunday or Monday. He stated that he deals strictly in cash and does not have a checking account. He explained the absence of any receipts in his receipt book between May 28, 1998, and January 30, 1999, by stating that the book had been out of his possession. Appellant also discussed the circuit judge's previous ruling in his favor on the matter.

In his closing argument, the attorney for Holt Bonding Company argued that the proceeding before the Board was barred by *res judicata* and collateral estoppel because the Benton County Circuit Court had already determined that the receipt was not forged and that the bond premium need not be returned.

The Board issued its decision on December 27, 1999, and made the following findings of fact:

> 3. John Van Curen accepted $3,500.00 (a check for $3000 and $500 in cash) to bond Hector Aquirre out on a $35,000 bond (which turned out through error to be a $3,500 bond). He failed to acknowledge that Hector Aquirre was not bondable due to a hold being placed on him by the Immigration and Naturalization

Service, and failed to return payment for said bond after being released from it by the court at his request.

4. John Van Curen accepted things of value ($3,500 plus fees) from a principal other than the permitted premiums ($350 plus fees) which were unreasonable in relation to the amount of the bond.

5. John Van Curen breached his trust relationship with Hector Aquirre by his failure to return money and other collateral to those who put it up as soon as he determined the INS had a hold on Aquirre.

6. John Van Curen signed Mr. Vasquez's name to a receipt for return of $3,115 and never returned the money to Carlos Vasquez. This is supported by the testimony of Carlos Vasquez and Sandra Aquirre and by the physical evidence of the matching signatures on the receipt and title used as collateral. The receipt appeared to be a tracing of the signature on the title. It is further bolstered by the testimony of David Bailey, who requested the return of the money on numerous occasions long after Van Curen testified he had returned it. This finding is further bolstered by John Van Curen's very infrequent use of the receipt book used for the transaction, with the preceding receipt having been used in May, months before. The Board simply did not believe the testimony of John Van Curen and chose to believe the testimony of the other witnesses.

The Board concluded that appellant had violated Arkansas Code Annotated § 17-19-210 (Repl. 2001) and voted to revoke appellant's license. It also directed him to reimburse Hector $3,500.

Appellant appealed the Board's decision to the Washington County Circuit Court, arguing that it was based upon insufficient evidence, was arbitrary and capricious, was affected by other error or law, was in excess of the Board's jurisdiction, and was barred by the claim preclusion and issue preclusion (or collateral estoppel) aspects of *res judicata*. The appeal was transferred to the Pulaski County Circuit Court where, on June 12, 2001, the circuit judge's findings included the following:

2. The Petitioner accepted $3,500 to bond Hector Aquirre out on a $35,000 bond and failed to return payment for said bond after being released from it by the court.

3. The Petitioner signed Carlos Vasquez's name to a receipt for the return of $3,115 and never returned the money to Carlos Vasquez.

4. Bail bondsmen are required to conduct their bail bond business in conformance with the statutes governing the profession, Ark. Code Ann. § 17-19-101 *et seq.*, and the rules and regulations promulgated pursuant to Ark. Code Ann. § 17-19-106(b)(4) by the Arkansas Professional Bail Bond Company and Professional Bail Bondsman Licensing Board.

. . . .

The decision of the Arkansas Professional Bail Bond Company and Professional Bail Bondsman Licensing Board is affirmed in part and reversed in part. The Court affirms the Respondents action in revoking the Petitioners license because that decision is supported by substantial evidence and is not arbitrary and capricious. Pursuant to Ark. Code Ann. § 25-15-212, that part of the administrative decision is affirmed.

The part of the administrative decision that directed the Petitioner to immediately reimburse Hector Aquirre $3,500 is reversed because the Respondent had no legal authority to direct the reimbursement.

Appellee has not filed a cross-appeal from the circuit court's reversal of the Board's direction that appellant reimburse Hector $3,500.

## Standard of Review

Our review, like that of the circuit court, is limited in scope and is directed not to the circuit court but to the decision of the administrative agency. *Tomerlin v. Nickolich,* 342 Ark. 325, 27 S.W.3d 746 (2000). It is not the role of the circuit courts or the appellate courts to conduct a *de novo* review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision. *Id.* Substantial evidence has been defined as valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support a conclu-

sion and force the mind to pass beyond conjecture. *Id.* The challenging party has the burden of proving an absence of substantial evidence. *Id.* To establish an absence of substantial evidence to support the decision, the challenging party must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion. *Id.* The question is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made. *Id.* It is the prerogative of the agency to believe or disbelieve any witness and to decide what weight to accord the evidence. *Id.* This court reviews the entire record in making this determination. *Id.; see also* Ark. Code Ann. § 25-15-212 (Repl. 2002). In reviewing the record, this court gives the evidence its strongest probative force in favor of the agency's ruling. *Arkansas Contractors Licensing Bd. v. Pegasus Renovation Co.,* 347 Ark. 320, 64 S.W.3d 241 (2001). Between two fairly conflicting views, even if the reviewing court might have made a different choice, the board's choice must not be displaced. *Id.*

▆▆ Administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency. *Tomerlin v. Nickolich, supra.* Because decisions regarding the licensing of bond companies and their employees turn on executive wisdom, it is appropriate to limit the scope of review on appeal. *Id.; Accord Arkansas Prof'l Bail Bondsman Licensing Bd. v. Oudin,* 348 Ark. 48, 69 S.W.3d 855 (2002).

## *Res Judicata*

▆ In his first, second, and third points, appellant argues that the Board's decision is barred by the claim preclusion and collateral estoppel aspects of *res judicata.* The Board asserts that appellant failed to raise this argument before the Board. We will not decide an argument raised for the first time on appeal. *Technical Servs. of Ark., Inc. v. Pledger,* 320 Ark. 333, 896 S.W.2d 433

(1995). However, in his response to Mr. Bailey's complaint, appellant did raise the Benton County Circuit Court's previous decision in his favor. Although he did not use the terms "*res judicata*" or "collateral estoppel," we believe that he preserved these arguments for appeal. Also, a copy of the March 12, 1999, hearing before the Benton County Circuit Court was presented to the Board. The Pulaski County Circuit Court found that appellant had adopted the *res judicata* arguments made by Holt Bonding Company's attorney at the Board hearing and that appellant deserved to have them heard on appeal. The Pulaski County Circuit judge found that the Benton County Circuit Court's decision was not *res judicata* as to the licensing issue; he also said that he was not sure that *res judicata* did not apply as to the refund of the money.

■■ The purpose of the *res judicata* doctrine is to put an end to litigation by preventing a party who had one fair trial on a matter from relitigating the matter a second time. *Brandon v. Arkansas W. Gas Co.*, 76 Ark. App. 201, 61 S.W.3d 193 (2001). Under the claim-preclusion aspect of the doctrine of *res judicata*, a valid and final judgment rendered on the merits by a court of competent jurisdiction bars the plaintiff or his privies from asserting the same claim or cause of action against the defendant or his privies. *Id.* When a case is based on the same events as the subject matter of a previous lawsuit, *res judicata* will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies. *Id.* The test in determining whether *res judicata* applies is whether matters presented in a subsequent suit were necessarily within the issues of the former suit and might have been litigated therein. *Finch v. Neal,* 316 Ark. 530, 873 S.W.2d 519 (1994); *Coleman Serv. Ctr., Inc. v. Federal Deposit Ins. Corp.*, 55 Ark. App. 275, 935 S.W.2d 289 (1996). The key question regarding the application of *res judicata* is whether the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question. *Brandon v. Arkansas W. Gas Co., supra.*

■■ Appellant argues that the Board's decision is barred by collateral estoppel. The doctrine of collateral estoppel or issue preclusion bars the relitigation of issues of law or fact actu-

ally litigated in the first suit. *Coleman Serv. Ctr., Inc. v. Federal Deposit Ins. Corp., supra.* When an issue of fact or law is actually litigated and determined by a valid and final judgment and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. *Id.* Collateral estoppel is based upon the policy of limiting litigation to one fair trial on an issue. *Id.* Collateral estoppel may be asserted by a stranger to the first judgment or decree but is applicable only when the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question in the earlier proceeding. *Office of Child Support Enforcement v. Willis,* 347 Ark. 6, 59 S.W.3d 438 (2001); *Coleman Serv. Ctr., Inc. v. Federal Deposit Ins. Corp., supra.* For collateral estoppel to apply, the following elements must be met: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; (4) the determination must have been essential to the judgment. *Id.*

Privity of parties in this context means a person so identified in interest with another that he represents the same legal right. *Blankenship v. Office of Child Support Enforcement,* 58 Ark. App. 260, 952 S.W.2d 173 (1997). The parties need not be precisely the same for a judgment in one action to bar another, as long as there is a substantial identity and the same claim is at stake. *Id.* Although strict privity in the application of *res judicata* is not required, there must be a substantial identity of parties to apply the doctrine. *Francis v. Francis,* 343 Ark. 104, 31 S.W.3d 841 (2000). We explained the application of this concept in *Blankenship v. Office of Child Support Enforcement, supra:*

> Here, the first case was brought by the State on behalf of the maternal grandmother, while the second and third cases were brought by the State on behalf of the mother. However, the same State agency represented each claim, the claims were identical — seeking paternity and support - and the basis for all three claims was identical - the minor child in question. Further, both the grandmother and mother presumably represent the child and its best interests, and it therefore seems logical to hold them in

privity on behalf of the child's interest, thus satisfying the fourth element of the *res judicata* analysis.

This approach is consistent with our holding in *Department of Human Servs. ex rel. Davis v. Seamster*, 36 Ark. App. 202, 820 S.W.2d 298 (1991). In *Seamster, res judicata* barred the State from relitigating a paternity action previously brought by the mother. However, we also recognized that paternity actions may be filed by the child as the named party, and that the child's rights in such matters may be different from those of the mother. *Id.* at 205, 820 S.W.2d 298. In the present case, while the State, the mother, and the maternal grandmother have exhausted their rights under *res judicata*, our holding here does not bar the child from pursuing her own paternity action.

58 Ark. App. at 264-65, 952 S.W.2d at 176.

Appellant contends that the issues of the forgery of the receipt, his obligation to return the bond money, and the INS hold were determined by the Benton County Circuit Court and, thus, the Board is bound by its findings on those issues. The circuit court agreed with him as to the obligation to return the money. That issue, however, is not before us because the Board has not appealed from the circuit court's reversal of the Board's decision. The Board had the burden of appealing from that aspect of the circuit court's order, and the effect of its failure to do so is to leave that court's decision on this matter intact.

 We reject appellant's arguments regarding the forgery of the receipt, appellant's purported cash refund of the money, and his obligation to refund the money when an INS hold is in place. The Board was not a party to the Benton County Circuit Court criminal proceeding, nor could it have been. Because it was not given a full and fair opportunity to litigate these issues, it should not be bound by claim preclusion or collateral estoppel. Also, the Board is not in privity with Mr. Bailey. Mr. Bailey served as Hector's criminal lawyer and brought the complaint before the Board. As to the question of whether appellant should be permitted to keep his bondsman's license, the Board's and Mr. Bailey's interests cannot be deemed to be so closely intertwined that a decision involving one should control the other — they do

not represent the same legal rights. The Board represents the rights of the public.

Appellee correctly points out that there are exceptions to the doctrine of *res judicata* that are based upon other important reasons of public policy, such as the public's interest in reaching the right result. *See* 46 AM. JUR. 2D *Judgments* § 522, at 787 (1994). In *Thangavelu v. Department of Licensing & Regulation*, 149 Mich. App. 546, 386 N.W.2d 584 (1986), the state's interest in protecting the public was a factor in the court's decision not to apply collateral estoppel in the revocation of a physician's license, even though he had been acquitted of the same criminal charge upon which the revocation was based. The court's statements are relevant here:

> In addition to the difference in the degrees of proof required, although the issues involved in the administrative hearing and the criminal proceeding may overlap, the purpose of a revocation proceeding substantially differs from a criminal proceeding. The hearing examiner discussed the remedial nature of revocation proceedings, stating:
>
> > "These two cases, when taken together, stand for the proposition that an administrative proceeding against a licensee is a different cause of action 'than a criminal proceeding against the same licensee, even if based on the same facts which resulted in acquittal of license in the criminal case. This is apparent when the statutes in question are compared since the licensing statute is for the protection of the public at large. As the Appellate Court of Illinois stated in *Kaplan v. Dept. of Registration & Education* [46 Ill. App. 3d 968, 5 Ill. Dec. 303], 361 N.E.2d 626, 631 (1977): '. . . The practice of medicine, in addition to skill and knowledge, requires honesty and integrity of the highest degree, and inherent in the State's power is the right to revoke the license of those who violate the standards it sets.' This revocation proceeding is not a second criminal proceeding placing the physician in double jeopardy. Rather, the purpose is to maintain sound, professional standards of conduct for the purpose of protecting the public and the standing of the medical profession in the eye of the public."
>
> We find no error in refusing to apply the doctrine of collateral estoppel in this case.

149 Mich. App. at 555-56, 386 N.W.2d at 589.

 We affirm the revocation of appellant's license and leave intact the circuit court's reversal of appellant's obligation to repay the money.

### Election of Remedies

 Appellant also argues in his second point that the election-of-remedies rule bars this action by the Board. The election-of-remedies rule is that, where a party has a right to choose one of two or more appropriate but inconsistent remedies, and with full knowledge of all the facts of the case and of his rights, he makes a deliberate choice of one, he is bound by his election and is estopped from again electing or resorting to the other remedy, although the judgment obtained in the first action fails to afford relief to the party making the election. *Sharpp v. Stodghill*, 191 Ark. 500, 86 S.W.2d 934 (1935). The essential elements of the election-of-remedies rule are: (1) both remedies were available; (2) they were inconsistent; (3) they are based on the same state of facts; (4) the same parties were involved in both suits; (5) the party against whom the rule is being raised was not mistaken as to the existence of any material facts. *Eastburn v. Galyen*, 229 Ark. 70, 313 S.W.2d 794 (1958). Because the Board was not a party to the Benton County Circuit Court criminal proceeding, and because the remedy of revoking appellant's license was not available in that proceeding, we reject this argument.

### The Sufficiency of the Evidence

Appellant argues in his fourth point that the Board's decision is not supported by substantial evidence. We disagree. Arkansas Code Annotated § 17-19-210 (Repl. 2001) provides that the Board may revoke a bondsman's license if he has violated any applicable statute or regulation or committed any fraudulent or dishonest acts. The Board's Rule and Regulation 1, § 23, requires a bondsman to return the premium if he cannot secure the arrestee's release from custody. No one disputes the fact that appellant refused to refund the premium when he learned that Hector would not be released because of the INS hold.

Additionally, the Board expressly found that it did not believe appellant's testimony that he refunded the $3,115 and that he did not forge the receipt. Mr. Vasquez and Sandra testified that appellant did not refund any of the bond premium and that Mr. Vasquez was not at the jail that Saturday, when appellant claimed he returned the money. Mr. Bailey testified that he first learned of the receipt at the hearing on March 4, 1999, even though he had discussed a refund with appellant on more than one occasion. Also, as the Board noted, the length of time between the dates on the copies in the receipt book casts doubt on appellant's version of the facts. Appellant's behavior in regard to the $3,115 is easily characterized as fraudulent or dishonest. The fact that Holt Bonding Company had actual possession of the collateral, as appellant points out, is of little importance, because appellant clearly refused to return it. We hold that the Board's decision to revoke appellant's license is supported by substantial evidence.

## The INS Hold

In his fifth point, appellant contends that the evidence does not support any finding as to his fault in regard to the INS hold. Appellant contends that he was justified in keeping the bond premium until he was discharged by a court of competent jurisdiction and cites *Liberty Bonding Co. v. State*, 270 Ark. 434, 604 S.W.2d 956 (Ark. App. 1980), and *Bobby Cox Bail Bonds, Inc. v. State*, 71 Ark. App. 119, 36 S.W.3d 752 (2000). Neither of those cases applies to this situation, because they do not address the bondsman's obligation to refund the premium if he is unable to secure the arrestee's release from jail. Additionally, appellant's argument that a bondsman is obligated to refund a bond premium only upon a surrender without cause, as opposed to one with cause, is not on point: no surrender occurred here.

Even if appellant had no obligation to determine that there was an INS hold on Hector, he cannot deny that he refused to refund the premium after he learned that he could not secure Hector's release because of the INS hold. The Board's Rule and Regulation 1, § 23 provides in pertinent part: "The principal shall be entitled to a refund of his premium when the bondsman fails to

secure the defendant's release from actual custody." We therefore reject appellant's arguments in support of this point.

*Whether the Board's Decision Was Arbitrary and Capricious*

Appellant argues in his sixth point that the Board's decision was arbitrary and capricious. Administrative actions may be considered arbitrary and capricious where they are not supported by any rational basis, *Tomerlin v. Nickolich, supra*, or hinge on a finding of fact based on an erroneous view of the law. *Woodyard v. Arkansas Diversified Ins. Co.*, 268 Ark. 94, 594 S.W.2d 13 (Ark. App. 1980). To set aside an agency decision as arbitrary and capricious, the party challenging the action must prove that it was willful and unreasoned action, without consideration, and with a disregard of the facts and circumstances of the case. *Tomerlin v. Nickolich, supra*. The requirement that an administrative decision not be arbitrary and capricious is less demanding than the requirement that it be supported by substantial evidence. *Id.* An action is not arbitrary simply because the reviewing court would have found differently. *Id.* Because the Board's decision to revoke appellant's license is supported by substantial evidence, it necessarily follows that it is not arbitrary and capricious.

Without citation to authority, appellant also contends that the Board should not have awarded the return of the bond premium because an offer by him and Holt Bonding Company to return the $385 before the March 1999 hearing had been rejected. We need not address this argument in light of our decision leaving intact the circuit court's reversal of appellant's obligation to repay the money.

Affirmed.

NEAL and BAKER, JJ., agree.